UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JODY CARR,<br><br>     Plaintiff,<br><br>v.<br><br>CPL. STELZER, SGT. SEGADELLI,<br>CPL. KIMES, WARDEN RANDY<br>BLADES, SHANNON CLUNEY, JEFF<br>ZMUDA, G.C. A. PITZER, G.C.<br>HALLUM, DR. DAWSON, CORIZON<br>MEDICAL, I.D.O.C., KENNETH<br>BENNETT, et al.,<br><br>     Defendants. | Case No. 1:15-cv-00133-CWD<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## INTRODUCTION

After screening Plaintiff Jody Carr's civil rights complaint, the sole claim

remaining is a retaliation claim against Sgt. Segadelli and Cpl. Stelzer. (Dkt. 29, 14, 2.)

Carr alleges he sent letters to the American Civil Liberties Union (ACLU) on behalf of

himself and other inmates to complain about prison conditions in early 2015.

Specifically, he complained that the double celling of inmates in the protective custody

unit violated *Balla v. Idaho State Board of Corrections*, 869 F.2d 461 (9th Cir. 1989).

After he sent the letters, the following allegedly occurred: (1) the inmates' Housing Unit E-1 was locked down on February 10, 2015; (2) Unit E-1 was divided in half; (3) many of the Unit E-1 inmates were taken to segregation ("the Hole"); (4) the inmates were ordered not to speak to each other about the ACLU class action lawsuit, other lawsuits, or grievances; and (5) on February 11, 2015, Defendants Stelzer and Segadelli threatened inmates with retaliation for complaining about conditions of confinement on February 11, 2015. Carr alleges a violation of his First Amendment rights.

Defendants' motion for summary judgment is now ripe for review. (Dkt. 30.) Having fully reviewed the record herein, the Court finds the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motion will be decided on the record before this Court without oral argument. Dist. Idaho L. Rule 7.1(d).

## FACTS

Carr is a prisoner in the custody of the Idaho Department of Correction (IDOC), and currently incarcerated at the Idaho State Correctional Center (ISCC). During the times mentioned in the Complaint, Carr was housed on tier E-1, which is part of the protective custody unit at ISCC. Protective custody separates offenders from the general population for the offenders' safety. The goal is to eventually integrate the offender back into the general population when it is reasonably safe to do so. The offenders on tier E-1 were considered a level two protective custody, which provides a structured transition period for those offenders preparing for integration with the general population, or

**MEMORANDUM DECISION AND ORDER - 2**

alternatively, a less restrictive environment for those offenders that do not require the security of level one protective custody.

Throughout the month of January and the first part of February 2015, several offense reports and information reports revealed prisoners on tier E-1 were involved in drug use, gambling, and extortion, as well as other criminal activities, such as tattooing. Other offenders were complaining about prisoners propositioning them for sexual favors. Lit candles were discovered in offenders' cells. Inmates complained also of being assaulted and threatened, or being exposed to other inmates' inappropriate sexual activity. Several fights had been investigated as well, resulting in injuries, and homemade weapons were found on the tier. On February 6, 2015, one offender complained of being threatened by multiple other offenders, and informed correction officers of where weapons were being hidden on the tier. (Dkt. 30-5 at 7 – 44.)

On January 19, 2015, Carr authored a letter to Shannon Cluney,[1] telling her he planned to be the star witness in a civil rights lawsuit alleging ISCC was in violation of *Balla*, because he and other inmates in protective custody were being double-celled, resulting in inmate violence. (Dkt. 34-16.) Carr demanded to be sent to Givens Hall[2] in return for dropping the lawsuit. (Dkt. 34-16 at 3.) A second letter was sent to Cluney on January 21, 2015, indicating all Carr wanted in return for dropping the lawsuit was housing, a job, and "no more retaliation." (Dkt. 34-17 at 3.) But, if he had to "go any further, I'll want money, injunctions, declarations and all officers/staff held publicly

---

[1] Shannon Cluney is an IDOC employee who responded to several of Carr's grievances and concern forms. (Dkt. 34-23; 34-24; 34-25; 34-26; and 34-27.)
[2] Givens Unit is a work camp located in Orofino, Idaho, and is part of the Idaho Correctional Institution in Orofino.

MEMORANDUM DECISION AND ORDER  - 3

accountable." *Id.* Several other prisoners wrote similar letters. (Dkt. 34-18 – 34-20.) The topic of the lawsuit arose again in response to Carr's February 15, 2015 concern form, which indicates that, during Carr's conversation with Cluney, Carr stated "all [he] wanted was to be placed in Givens Hall, in lieu of filing a lawsuit." (Dkt. 34-24.)[3]

On February 9, 2015, the prisoners had received complaint forms from the ACLU to fill out and return. (Dkt. 34-6 at 3.) The ISCC mail log confirms that Carr, as well as Fitch, received mail from the ACLU on February 9, 2015. (Dkt. 35-1, 35-3.)

On February 10, 2015, a battery and altercation occurred in housing unit DEF in E-1 pod.[4] During unit day room time, one offender assaulted another by hitting him with a closed fist to the face. To ensure the safety of the population, the tier was secured and an investigation ensued. Shift Command Staff Lt. Angeletti locked down pod E-1 as a result. The investigation revealed the altercation involved six offenders, who were seen on video congregating in one cell before the assault. Those six offenders were placed in segregation pending investigation. (Dkt. 30-3 at 7.)

On February 11, 2015, Segadelli and Stelzer conducted a tier meeting on E-1. During the meeting, Segadelli and Stelzer informed the offenders that illegal activity would not be tolerated on the tier, and reminded the E-1 population of the purpose of protective custody. The offenders were informed that, after the recent offenses and the

---

[3] Carr's threats are remarkably similar to those he made in *Carr v. Higgens*, No. 1:13–cv–00380–REB, 2014 WL 4411238 *14 (D. Idaho Sept. 5, 2014). In that case, Carr on April 8, 2013, filed a grievance stating: "I want to go to the Farm or Givens Hall away from all of you NOW! Or I file suit and Lord willing retain an attorney! Enough is enough!" On April 9, 2013, he was transported to IMSI, C–Block, a protective custody unit.
[4] The defendant correctional officers appear to use the term "pod" and "tier" interchangeably. Regardless, E-1 pod, or tier E-1, appears to be the same building, located within housing unit DEF. (*See* Dkt. 30-3 at 7.) The Court has used the term tier or pod in conformity with how it is used in Defendants' declarations and associated exhibits.

**MEMORANDUM DECISION AND ORDER  - 4**

violence that occurred on February 10, 2015, to hold the offenders accountable for their

behavior and to ensure the safety of the offenders on the tier, the solution under IDOC

policy was to send level two protective custody offenders to level one protective

custody,[5] if their behavior warranted modification to their placement.

Segadelli and Stelzer deny threatening to place the inmates in administrative

segregation for filing a concern form, grievance, or lawsuit. Carr, however, claims

otherwise, and submitted his own affidavit as well as fourteen affidavits from other

prisoners to support his claims. For example, prisoner Michael Brown states that

Segadelli and Stelzer said: "You want to complain? Well, I gave you life and I can take it

away, Admin said I can send you where ever I decide to," and that they would "pull us

out of protective custody, put us back into General Population and get us 'smashed out'

or send us to 'Ad-seg' aka The Hole." (Dkt. 34-2 at 2.) Brown contens this was said in

retaliation, because Carr, and others, including Brown, wrote letters to the ACLU and had

received a response on February 9, 2015, just prior to the meeting. *Id.* The affidavits of

Mark Fitch, Adam Ramirez, Paul Gutierrez, Joseph Stanka, Levi Hawkins, James

Sukraw, Ken Rawley, and Charlie Smith are substantially similar to Carr's and Brown's

affidavits. (Dkt. 34-2 – 34-11; 34-15.) Erik Payne, however, did not cite any specific

incident---only that inmates are "often retaliated against" if they file concern forms,

grievances, tort claims, or lawsuits. (Dkt. 34-10 at 2.)

After the tier meeting, Carr sent in a grievance to ISCC, which was identical to

several other prisoners' grievances, all of which alleged Segadelli and Stelzer threatened

---

[5] Level one protective custody is more restrictive than level two.

**MEMORANDUM DECISION AND ORDER  - 5**

them if they spoke to the ACLU. The grievances were investigated, and Warden Blades determined the allegations were false. (Dkt. 34-28.)

In response to Carr's March 2, 2015 concern form about the February 11, 2015 tier meeting, Stelzer responded that the tier meeting was "simply informative and a courtesy from investigations to inform the P.C. population that if there was violence on the tiers the only way to hold offenders accountable and to protect them would be to seek ad-seg housing per policy." (Dkt. 34-28.) Stelzer and Segadelli claim Carr's statements were taken out of context. While Stelzer admitted to using the phrase, "I gave you life and I can take it away," he explained that it was said in the context of an analogy, in an attempt to explain to the prisoners that if they continued to act up or engage in criminal activity on the tier, their freedom would be taken away. (Dkt. 35-2 at 2.)

At the time of the events described above, Segadelli was employed as an Investigations Sergeant and Stelzer was employed as an Investigations Corporal at ISCC. As an investigative sergeant or corporal, neither Segadelli nor Stelzer has authority to make changes to offender housing accommodations. Warden Randy Blades denies ever giving Segadelli or Stelzer permission or authority to change housing accommodations, protective custody status, or place offenders in administrative segregation.

With regard to prisoner mail, if prisoners are suspected of using incoming mail for illegitimate purposes such as gang activity, introduction of narcotics, or the like, ISCC will monitor incoming mail sent to those prisoners. A list is created, and re-evaluated monthly. Segadelli and Stelzer have access to the monitored mail list for any ongoing investigation, but they do not have access to any other offenders' mail activity. Between

**MEMORANDUM DECISION AND ORDER  - 6**

January of 2015 and April of 2015, Carr was not on the monitored mail list. (Dkt. 30-5 at 47-49.) Segadelli and Stelzer deny they had any knowledge of any offender's correspondence with the ACLU, or any knowledge of a specific offender's communication with the ACLU, at the time of the tier meeting on February 11, 2015. Additionally, Segadelli and Stelzer deny they had any knowledge that any offenders signed the legal mail log on February 9, 2015, to receive legal mail.

## DISCUSSION

### 1.    Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over

**MEMORANDUM DECISION AND ORDER  - 7**

irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co.*, 336 F.3d at 889.

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out

**MEMORANDUM DECISION AND ORDER  - 8**

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## 2.     Section 1983 Standard

Carr's claims arise under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, a plaintiff must establish a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Prison officials are generally not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677

(2009) ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

**3.      Evidentiary Objection**

As an initial matter, Carr objects to the Court's consideration of the Declarations of Segadelli, Stelzer, and Warden Blades, arguing they are inadmissible because they are not signed or sworn to. Segadelli, Stelzer, and Blades submitted declarations under penalty of perjury, and submitted signatures with "/s/". Declarations, as opposed to sworn affidavits, are expressly permitted by Fed. Rule Civ. P. 56(c)(4). *See also* 28 U.S.C. § 1746 (allowing for unsworn declarations subscribed as true under penalty of perjury). The Court's electronic case filing procedures permit signatures, including those on declarations, to be filed electronically and the declarations may be filed with the declarant's signature noted by a "/s/". The attorney submitting the document is required to retain the original, ink-signed declaration. Carr's objection is therefore overruled.

Additionally, to the extent Carr seeks to rely upon his verified complaint as evidence of the truth of his allegations, Fed. Rule Civ. P. 56(c) does not allow Carr to rely upon the pleadings to establish a genuine dispute as to a material fact. The facts were instead gleaned from the declarations, affidavits, and records attached thereto, which are in the record before the Court.

**4.      *Balla* Allegations**

Next, the Court will discuss Carr's *Balla* allegations that are at the heart of Carr's threatened lawsuit that he claims here triggered the retaliation. Carr asserts that, between April 9, 2013, and December 10, 2014, he was housed in the protective custody unit, C-1,

at IMSI, and "double celled" in violation of *Balla v. Idaho State Board of Corrections*, 869 F.2d 461 (9th Cir. 1989).[6] He alleges also that the practice continued on pod E-1 at ISCC. He alleges single-celling inmates in the close custody unit is required to protect prisoners' rights to personal safety, and that, had he not been double-celled, he would not have been attacked by his cellmate on September 20, 2014. Carr's *Balla* claims are also the genesis for his contact with the ACLU.

Carr's *Balla* claim was not alleged in Carr's complaint. Further, only the retaliation claim was allowed to proceed. The *Balla* claim is therefore beyond the scope of this lawsuit, and is not properly before the Court in connection with Defendants' motion for summary judgment.

Moreover, Carr "may not challenge, in this case, a failure to comply with a court order in a different case."[7] *Campbell v. Yordy*, 2016 WL 7256812, at *6 (D. Idaho 2016). Rather, "a claim that a defendant is violating the Constitution is cognizable in this separate § 1983 action—a claim that a defendant is violating a court order in a different case is not." *Id.* Additionally, the federal court injunction that ordered close custody inmates to be single-celled applies only to the Idaho State Correctional Institution (ISCI), not to ISMI or ISCC, and applies only to housing Units 8 and 9 of ISCI due to the specific circumstances under which they were housed in the mid-1980's. *See Balla v. Bd. of Corr.*, 656 F. Supp. 1108, 1117 (D. Idaho 1987). In 1989, the Idaho Maximum Security Institution (IMSI) was opened. The *Balla* injunction is a court order that applies

---

[6] *Balla v. IDOC*, Case No. 1:81-cv-1165-BLW, is a 35-year old class action case that remains pending in this Court.
[7] Any such challenge must be brought in the original action, through class counsel.

**MEMORANDUM DECISION AND ORDER - 11**

only to ISCI and, in particular, only those housing units specified in the injunctive relief order.[8]

### 5.     Retaliation Claims – Segadelli and Stelzer

A First Amendment retaliation claim must allege the following: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Although a "chilling effect on First Amendment rights" is enough to state an injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of arbitrary retaliation" are insufficient to state a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985).

"A prisoner suing prison officials under section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving

---

[8] The order states as follows:
        IT IS HEREBY ORDERED that defendants be, and are hereby, PERMANENTLY ENJOINED from:
        1. Double-celling inmates in Unit 1 or causing more than twelve (12) inmates to be housed in Unit 1 at any time.
        2. Housing more than thirty-six (36) inmates in Unit 2 at any time.
        3. Housing more than thirty-six (36) inmates in Unit 3 at any time.
        4. Double-celling inmates in Unit 7 for more than three (3) weeks, or triple-celling inmates, or housing more than eighty (80) inmates in Unit 7 at any time.
        5. Double-celling maximum custody inmates or housing more than seventy-eight (78) inmates in Unit 8 at any time.
        6. Double-celling close custody inmates or housing more than seventy-eight (78) inmates in Unit 9 at any time.
        7. Housing more than one hundred eight (108) inmates in Units 10 and/or 11 at any time.
        8. Housing more than one hundred forty-four (144) inmates in A–Block at any time.
*Balla*, 665 F. Supp. at 1119 – 20.

**MEMORANDUM DECISION AND ORDER  - 12**

institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994) (per curiam); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").

But not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry in determining whether a plaintiff has stated a viable retaliation claim "asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty*., 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotation marks omitted). If it would not, then "the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). *See also Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) ("The [de minimis ] standard achieves the proper balance between the need to recognize valid retaliation claims and the danger of federal courts embroiling themselves in every disciplinary act that occurs in state penal institutions.") (internal quotation marks and alteration omitted); *ACLU of Maryland, Inc. v. Wicomico County*, 999 F.2d 780, 786 n. 6 (4th Cir. 1993) (per curiam) ("[T]hese § 1983 plaintiffs suffered no more than a de minimis inconvenience and..., on the facts of this case, such inconvenience does not constitute cognizable retaliation under the First Amendment."). While "timing can be properly considered as circumstantial evidence of retaliatory intent," there must generally be something more than simply

timing to support an inference of retaliatory intent. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

Carr has not brought forth evidence tending to raise a genuine issue of material fact as to Defendants' intent. Despite the additional affidavits corroborating Carr's story, the affidavits do not advance any facts indicating either Segadelli or Stelzer took action on account of Carr's, or others', protected conduct. The only aspect of Carr's claim that Segadelli and Stelzer were personally involved with was the tier meeting on February 11, 2015, two days after Carr and Brown signed the prison mail log for mail from the ACLU. Carr, and the other inmates, dispute the statements made by Segadelli and Stelzer during the meeting, claiming they were threatened for corresponding with the ACLU and filing grievances.

Carr's version of the facts, based in large part on the temporal proximity between his receipt of the ACLU mail and the tier meeting, may be sufficient to draw an inference of retaliation. However, the larger record of the grievances and concern forms filed in January and February of 2015, which led to the tier meeting on February 11, 2015, reveals the meeting occurred to address the criminal activity on the tier and to warn the inmates that, if such activity continued, their level 2 protective custody status would be taken away. Carr has not produced sufficient evidence to demonstrate that the tier meeting was not for a legitimate penological purpose.[9]

---

[9] Incidentally, the two other prisoners who filed similar claims voluntarily dismissed their lawsuits. *Brown v. Dobler*, No. 1:15-cv-00132-CWD (Dkt. 87) ("Plaintiff at this time does not wish to continue to pursue this case" without prisoner Jody Carr's assistance); *Fitch v. Blades*, No. 1:15-cv-00162-BLW-CWD (Dkt. 33) (requesting to dismiss the claims against Stelzer, Segadelli, and Blades "for the reason that it is and [has] become frivolous.").

**MEMORANDUM DECISION AND ORDER - 14**

Further, other than the two days that elapsed between Carr's receipt of mail and the tier meeting, there is no evidence Stelzer or Segadelli had any knowledge of Carr's correspondence with the ACLU. They both deny having had access to the regular prison mail log. Even if Stelzer or Segadelli knew Carr and other inmates received mail from the ACLU, Carr has not shown that Stelzer and Segadelli had knowledge of the contents of the mail Carr received. Both Stelzer and Segadelli deny threatening Carr or other inmates with placement in Ad-seg for pursuing communication with the ACLU. Though Carr disputes Stelzer's and Segadelli's statements, the dispute is not genuine. Carr relies solely upon the inference between receipt of an envelope from the ACLU, and the tier meeting that occurred two days later, along with the "corroborating" affidavits of other inmates, to allege he was threatened for communicating with the ACLU.

While Carr is correct that the Court cannot weigh witness credibility at the summary judgment stage, neither is the Court required to adopt unreasonable inferences. The timing here is suspect—but, there must generally be something more than simple timing to support an inference of retaliatory intent. *See Pratt*, 65 F.3d at 808. The submission of fourteen other affidavits, all similar to Carr's affidavit, does not somehow transmute the inference deduced from the timing into fact for purposes of summary judgment, especially considering the record indicates the tier meeting was held in response to disciplinary problems on the tier. Further, it is abundantly clear from the record before the Court that Carr took full advantage of the grievance system, and has filed other lawsuits in this Court. And finally, evidence in the record indicates Carr was the one making the threats by using the potential lawsuit as leverage for requesting a

**MEMORANDUM DECISION AND ORDER  - 15**

transfer, a tactic he has employed in other cases. *See Carr v. Higgens*, No. 1:13–cv–00380–REB, 2014 WL 4411238 *14 (D. Idaho Sept. 5, 2014), supra note 1.

An investigation was undertaken following the tier meeting to corroborate Carr's, and the other inmates', statements. Carr and other inmates filed identical concern forms and grievances, complaining about what Segadelli and Stelzer said during the tier meeting. Blades found no evidence threats were made. Accepting Carr's argument would lead to the Court accepting bare allegations of retaliation, and unreasonably inferring the retaliation occurred due to the mere timing between the receipt of legal mail and the tier meeting.

Carr has failed to rebut Defendants' showing that there is no genuine dispute as to any material fact with respect to Carr's First Amendment claim under section 1983.

## CONCLUSION

Carr has not shown any genuine dispute as to any of the material facts. Defendants' motion for summary judgment will be granted, and this case will be dismissed with prejudice.

**MEMORANDUM DECISION AND ORDER  - 16**

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendants' Motion for Summary Judgment (Dkt. 30) is **GRANTED**.

        Judgement will be entered in favor of Defendants.

DATED: March 15, 2017

Honorable Candy W. Dale
United States Magistrate Judge